**UNITED STATES of America**

v.

**Murray B. BAKER and Victor O. Gates, Sr.**

Crim. No. 13875.

United States District Court
M. D. Pennsylvania.
April 30, 1965.

tors of Industrial Press Company, Inc., hereinafter called "Industrial".

(b) Industrial was incorported January 11, 1962 in Pennsylvania, and the incorporators were Murray B. Baker, defendant herein, Frank Swigert, Jr., and Regina M. Francis.

(c) During the calendar year 1962, said defendants, Baker and Gates, were Vice President and President respectively, of said Industrial.

(d) During the calendar year 1962, said defendants, Baker and Gates, were actively engaged in the management and operation of said Industrial.

(e) On July 23, 1962 said defendants, Baker and Gates, caused to be transported from Harrisburg, Pennsylvania, in this district, to Republic of Haiti via New York City, New York, 25,000 books of lottery tickets, slips, papers and writings, which had previously been printed by them at Industrial aforesaid, immediately prior to the shipment thereof, all of which said material was to be used and was designed for use in a lottery based upon the outcome of a sporting event, to wit, the running of the International Horse Race at Laurel, Maryland, on November 12, 1962; the said shipment of books of lottery tickets, etc., was consigned from Harrisburg, Pennsylvania, to Comataire, S. A., Republic of Haiti, via New York City, New York. The shipment was made in the following manner, from Harrisburg, Pennsylvania, to New York City by Hall's Motor Transit Company, a Pennsylvania common carrier, via Rapid Distributing Corporation, which company had been contacted and hired by defendants, Baker and Gates, to transport said books of lottery tickets, etc. Said shipment consisted of 20 cardboard cartons, total weight 865 pounds. That a true and correct copy of appropriate freight bill of Hall's Motor Transit Company was attached, evidencing said shipment from Industrial to S/S Santa Margarita, Amer. 58 North River, N. Y., N. Y., Port-au-Prince, Haiti, via Harold S. Unger, Inc., and delivery of said shipment was made by Hall's aforesaid via Rapid aforesaid, at New York City on

Bernard J. Brown, U. S. Atty., Scranton, Pa., for plaintiff.

Allen M. Mesirow, Washington, D. C., Goldberg, Evans & Katzman, Harrisburg, Pa., for defendants.

FOLLMER, District Judge.

Defendants, Murray B. Baker and Victor O. Gates, Sr., pleaded not guilty to an Indictment of three counts, waived jury trial and in lieu of taking testimony before the Court, submitted the case on a Stipulation of Facts.

The first two counts of the Indictment charged that defendants did knowingly, willfully and intentionally carry, transport and caused others to carry and transport in interstate commerce from Harrisburg, Pennsylvania, to New York City, New York, and thereafter in foreign commerce to the Republic of Haiti, books of lottery tickets, slips, papers and writings, knowing that said books of lottery tickets, slips, papers and writings were used, to be used, and adapted, designed and devised for use in a numbers, policy, bolita or similar game based upon the outcome of a sporting event, as they then and there well knew, all in violation of 18 U. S.C. § 1953(a) and § 2. The third count is a conspiracy count.

It has been stipulated that,

(a) During 1962, Murray B. Baker and Victor O. Gates, Sr., were engaged in the industrial printing business in the Telegraph Building, 216 Locust Street, Harrisburg, as officers and active opera-

July 24, 1962; then to Republic of Haiti via ocean freight on S/S Santa Margarita.

(f) On July 30, 1962 said defendants, Baker and Gates, caused to be transported from Harrisburg, Pennsylvania, to Republic of Haiti via Brooklyn, New York, 5,000 books of lottery tickets, etc., which had been printed at Industrial aforesaid, which said lottery tickets, etc., were to be used and were designed for use in a lottery based upon the outcome of a sporting event, to wit, the running of the International Horse Race at Laurel, Maryland, on November 12, 1962. The said shipment was consigned from Harrisburg, Pennsylvania, to Comataire, S. A., Republic of Haiti, via Brooklyn, New York, and was made as follows, the shipment from Harrisburg to Brooklyn was by Hall's Motor Transit Company, a Pennsylvania common carrier, via Rapid Distributing Corporation, which company had been contacted and hired by defendants, Baker and Gates, to transport said shipment consisting of 4 cardboard cartons, total weight 225 pounds. Freight bill attached to Stipulation evidenced shipment from Industrial to S/S Poseidon Port-au-Prince, Foot of 31st, Brooklyn, New York, and delivery of said shipment was made by Hall's Motor Transit Company via Rapid Distributing Corporation at Brooklyn, New York, on July 31, 1962, and thence to Republic of Haiti via ocean freight on S/S Poseidon.

(g) Attached to the Stipulation is a sample book of the lottery tickets and allied papers printed at Industrial by defendants immediately prior to the shipments made on July 23, 1962 and July 30, 1962, which book it was agreed is representative of the books of lottery tickets shipped by defendants, Baker and Gates as aforesaid.

(h) The said books of lottery tickets, etc., were printed by defendants, Baker and Gates, for the "Republic of Haiti Welfare Fund Sweepstakes", which was operated by a Port-au-Prince, Haiti, firm known as Comataire S. A., incorporated in Haiti on January 18, 1962, and approved by Presidential Decree of the President of the Republic of Haiti on April 26, 1962.

(i) The Republic of Haiti Welfare Fund Sweepstakes is a legally constituted sweepstakes lottery under the laws of Haiti, and is under the control of an agency of the Haitian Government known as "Le Lotterie de 1-Etat Haitian" (the lottery of the Republic of Haiti).

(j) Defendants, Baker and Gates, and Industrial were paid approximately $14,000.00 for printing said tickets.

(k) On January 8, 1963, at approximately 5 P.M., Pennsylvania State Police and Federal Officers possessing, and under authority of, a search warrant duly issued to Detective Sergeant Robert L. McCartney, Pennsylvania State Police, by Alderman Elizabeth Armstrong Wagner, Harrisburg, Pennsylvania, entered Industrial, Room 115, Telegraph Building, Harrisburg, Pennsylvania, and seized, inter alia, the following:

(1) Printed books of lottery tickets, etc., which had been printed by Industrial, and were to be used and designed for use in a lottery based on the outcome of a sporting event, to wit, running of International Horse Race at Laurel, Maryland, on November 12, 1962;

(2) Freight bill from Hall's to Industrial dated July 23, 1962, and referred to hereinabove.

(3) Freight bill from Hall's to Industrial dated July 30, 1962, and referred to hereinabove.

(4) Numerous plates used for printing books of lottery tickets, etc.

(l) As a result of the entry made and evidence seized at Industrial on January 8, 1963, by Pennsylvania State Police and Federal Officers aforesaid, further investigation was conducted by Agents of the Federal Bureau of Investigation and the stipulated facts were developed.

On January 17, 1964, the defendants upon being arraigned in open Court entered pleas of not guilty.

On May 4, 1964, a hearing was held on defendants' motion to suppress certain evidence. After hearing, the motion to suppress was denied.

On December 14, 1964, the case was called for trial and, as above indicated defendants both waived jury trial and in lieu of testimony filed a Stipulation as to facts agreed upon by counsel for the Government and the defendants individually and their counsel. At the conclusion of the evidence, defendants renewed their motion to suppress which had previously been denied by the Court, and also moved for judgment of acquittal.

As to the motion to suppress,—

Two of the searches and seizures involved herein occurred on January 8, 1963, one from the premises located at 216 Locust Street, Harrisburg, Pennsylvania, sometimes herein called Telegraph Building, the other from an automobile of defendant, Baker. The third search and seizure occurred on February 7, 1963, from a garage on Paxton Street, Harrisburg, Pennsylvania.

On January 8, 1963 Detective Sergeant Pennsylvania State Police Robert L. McCartney filed with Alderman Elizabeth A. Wagner an application for a search warrant, which in pertinent part states:

"On this 8th day of January, 1963 * * * personally appeared Det. Sgt. Robert L. McCartney, P. S. P., who being duly sworn according to law, doth depose and say from his own personal knowledge based on observations, surveillance and investigation, and/or from information which the affiant verily believes to be true and correct, affiant verily says that there is probable cause to believe, and just and reasonable grounds for believing, and does believe that certain gambling devices and paraphernalia to wit * * * are possessed, maintained, * * * upon a certain premises * * *

"That the facts upon which the affiant relies and verily believes are as follows:

"That on or about the 15th day of November, 1962, information of a reliable and confidential source revealed that lottery tickets were being printed at above location and that subsequent investigation revealed that known lottery operators were frequenting said establishment and contacting said Victor O. Gates at various times and places and that on said occasions packages of various sizes and shapes were being transferred from automobiles of Victor O. Gates and known lottery men whom he met.

"Affiant therefore prays that a search warrant may issue to a proper Peace Officer directing him to search said place or thing and seize said thing or things.

"Robert L. McCartney

"COMPLAINANT"

Defendants contend that the January 8, 1963 search and seizure were unreasonable and illegal in that the sworn complaint for search warrant failed to show probable cause; information was stale; no basis in affidavit upon which Magistrate could find the unnamed informant reliable.

The sworn affidavit of Sergeant McCartney sets forth that the Pennsylvania State Police initially received information on November 15, 1962 from a confidential source that defendants were printing lottery tickets at Industrial, Room 115, Telegraph Building, Harrisburg, Pennsylvania; that subsequent surveillance and investigation revealed that known lottery operators were frequenting the establishment and were contacting defendant Gates at various times and places and that on said occasions packages of varying sizes and shapes were being transferred from automobiles of Gates and known lottery men whom he met.

At the hearing on the motion to suppress Sergeant McCartney testified that the Industrial operation in Telegraph Building *was under constant and continuous surveillance from November 15, 1962 to January 8, 1963,* when the raid occurred; that he and the other police officers observed the known lottery operators frequenting the establishment and contacting defendant Gates at various times; that these facts were made known

to Alderman Wagner at the time the warrants were issued. This testimony was corroborated by the Alderman who issued the warrants.

Sergeant McCartney's testimony clearly set forth that information came to his Harrisburg headquarters from State Police in Altoona that lottery material was being printed in the Telegraph Building, Harrisburg, Pennsylvania; that certain tested and proven confidential sources had identified as the press operators the defendants, Baker and Gates; that a room was rented in the Telegraph Building and that from certain vantage points in the building the officers could identify people going in to the Industrial office; that at the time in question Baker was known to the officer as a lottery man and that another frequenter of the building, one Cyrus Crawl, was a known lottery man; that the involved premises were under constant and uninterrupted surveillance from November 15, 1962 when the officer first learned of the situation until January 8, 1963 when the warrants were applied for. As a matter of fact, surveillance was still in operation when the raid was conducted. The Sergeant further testified that the information set forth in the complaint was the combined information of an investigating force of from ten to twelve men from the Harrisburg area; that the source informers had been used before and were found reliable; that both defendants were seen going in and out of the Industrial, both alone and together, and both were seen carrying cartons in and out; that both defendants were seen by McCartney and another officer proceeding from the Telegraph Building to a point four or five miles distant in Colonial Park Plaza; that they there met Crawl; that four packages about eighteen inches square were taken from Crawl's car and placed in the rear of Gates' car; that the defendants, Baker and Gates, then came back to the Telegraph Building and carried the boxes into Industrial; that the surveillance later that evening disclosed that one of the boxes was opened and contained what appeared to be treasury balance tickets; that this information resulted from the group or collective surveillance.

In United States v. Clancy, 7 Cir., 276 F.2d 617, 628 (1960), the Court said:

"* * * Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief by a man of reasonable caution that a crime is being committed. * * *"

Hearsay may be the basis for a warrant. Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959). The proof necessary to justify the warrant is that which shows probable cause for a search not what would be competent evidence upon a trial to prove appellant's guilt.

At no time was this case permitted to become stale. The surveillance continued actively and uninterruptedly for over one month. I am of the opinion that the Magistrate was fully informed and on the basis of her information she made her own independent determination that there was probable cause and accordingly issued the search warrant. I also conclude that the content of the affidavit taken in connection with the statements of the Sergeant to the Magistrate constituted ample basis upon which the Magistrate could conclude that the unnamed informant was reliable.

Motion to suppress will be denied.

As to the motion of defendants for judgment of acquittal:

The substantive statute alleged to have been violated by defendants is 18 U.S.C. § 1953, which reads:

"(a) Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking;

or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined not more than $10,000 or imprisoned for not more than five years or both.

"(b) This section shall not apply to (1) parimutuel betting equipment, parimutuel tickets where legally acquired, or parimutuel materials used or designed for use at racetracks or other sporting events in connection with which betting is legal under applicable State law, or (2) the transportation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statutes of that State, or (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication."

With relation to paragraph (a) supra, it is defendants' position that it was the manifest intention of Congress that only certain types of games be prohibited from commerce and its intent was clearly shown by the language devised, that is, "numbers, policy, bolita, or similar game"; that these lotteries have a particular design and similar characteristics and it was incumbent upon the Government to prove beyond a reasonable doubt that the material transported was to be used or designed for use in a game having these similar characteristics.

In the legislative history of the Bill (now 18 U.S.C. § 1953), United States Code Congressional and Administrative News, Vol. 2, 87th Congress, First Session 1961, at page 2635, appears the following statement regarding the said legislation:

"Under the proposed bill, it would be a felony to send or carry knowingly in interstate or foreign commerce any wagering paraphernalia or device adapted or designed for use in bookmaking, wagering pools with respect to a sporting event, or numbers, policy, bolita, or similar game. The violation carries with it a penalty of a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. The language of the proposal make clear that it will include slips, papers, or paraphernalia which may be used in a *lottery scheme* not yet in existence or already completed. It also bans the interstate transportation of slips recording the accounts and numbers bet in a numbers lottery and betting slips and other material utilized in a bookmaking operation. The game known as bingo does not come within the scope of this bill, however." (Emphasis supplied.)

Assistant Attorney General Herbert J. Miller in testifying before the House Judiciary Committee on the Bill, stated that the "Irish Sweepstakes" (a lottery similar to that of the Republic of Haiti Welfare Fund Sweepstakes) would be included within the purview of the statute.[1]

■ There is no doubt but that the clear Congressional intent was to include all types of lottery schemes within the purview of the statute as embraced in the words "numbers, policy, bolita, or similar game".

In Forte v. United States, 65 App.D.C. 355, 83 F.2d 612, 105 A.L.R. 300 (1936), the Court was construing a lottery statute in effect in the District of Columbia. Defendant contended he was operating a "numbers game" based on the outcome of horse races and bets were direct wagers and this scheme was not within the purview of the lottery statute. The Court stated, inter alia (83 F.2d page 615):

"The first contention of counsel for appellant is that the numbers game is a direct bet or wager on horse races. This contention has been generally rejected by the courts. * * * The results of the horse races are employed merely to determine the

1. See report of Subcommittee, Committee on Judiciary, House of Representatives, 87th Congress, First Session on H.R. 6571 at page 352.

winning number, it being entirely immaterial to the player of the numbers game which horses win. The player merely guesses that the result of mathematical calculations, based upon the prices paid at a certain track, will be a certain number.

"It is further contended that the numbers game is not a lottery because there must be a physical drawing of the certificate or ticket. One of the essential elements of a lottery is the awarding of a prize by chance, but the exact method adopted for the application of chance to the distribution of prizes is immaterial. * * * Any reasonable interpretation of the statute indicates that it is the prize and not the ticket which is to be drawn. The language of the statute is 'any ticket * * * or other device purporting or intended to guarantee or assure to any person, or entitle him to a chance of drawing or obtaining a prize, to be drawn in any lottery, or in the game or device commonly known as policy lottery or policy.' * * *

"In our opinion the 'numbers game' is a lottery.

"Appellant's contention that the prohibition of the statute is limited to the so-called 'policy game' cannot be sustained. We think that section 863, which is captioned 'Lotteries,' is broad enough in its scope to prohibit the sale, transfer, or possession of any ticket intended to assure a chance of obtaining a prize 'to be drawn in any lottery.' While it may have been the intent of the Congress chiefly to suppress the policy game, which was prevalent at the time of the enactment of this statute, there is nothing to indicate that the prohibition is limited to this one type of

lottery. On the contrary, the statute covers broadly any form of lottery.

\* \* \* \* \*

"The policy game is undoubtedly a lottery * * *."

In Brooklyn Daily Eagle v. Voorhies, C.C.E.D.N.Y., 181 F. 579, 581 (1910), the Court stated:

"It has been held in numerous cases * * * that the three necessary elements of a 'lottery' are the furnishing of a consideration, the offering of a prize, and the distribution of the prize by chance rather than entirely upon the basis of merit." [2]

■ There can be no question from an examination of the sample book of lottery tickets of the Haiti Welfare Fund Sweepstakes here in evidence that the said Fund is a lottery within the purview of 18 U.S.C. § 1953. There are present in this case the three necessary elements of a "lottery", namely, (1) a consideration paid, the sum of $2.00 for each ticket; (2) the offering of a prize, and (3) the fact that the distribution of the prizes is based upon chance and not merit.

■ There is not the slightest doubt but that defendants, Baker and Gates, are guilty as charged in the Indictment and I so find.

■ Defendants contend that the betting materials caused to be transported were to be used and were designed for use in a sweepstakes based upon the outcome of a sporting event, to wit, the running of the International Horse Race at Laurel, Maryland, on November 12, 1962, and that such betting is legal under the statutes of the Republic of Haiti. They further contend that the exempting paragraph of the statute excepts from the condemnation of the statute the transportation of such materials into a

2. See exhaustive discussion of the numbers, policy and lottery schemes in which the Court concluded, in effect, that the terms were interchangeable, that the numbers game is but a variation of a policy play and that both are lotteries. Commonwealth of Pennsylvania v. Banks, 98 Pa.Super. 432 (1930); see also,

Horner v. United States, 147 U.S. 449, 13 S.Ct. 409, 37 L.Ed. 237 (1893); Boasberg v. United States, 5 Cir., 60 F.2d 185 (1932); Wolf v. Federal Trade Commission, 7 Cir., 135 F.2d 564 (1943); Pepe v. Anderson, D.C.Del., 205 F.Supp. 313 (1962); United States v. Whiting, 4 Cir., 311 F.2d 191 (1962).

"State" in which such betting is legal under the statutes of that "State"; that since the condemnation is to both interstate and foreign commerce, it follows that the exception applies to both interstate and foreign commerce and that therefore the term "State" is used in its generic sense, meaning independent political entity.

■ I do not agree. I do not think that the case qualifies under the exception clause of the statute for the reason that the Republic of Haiti is not a State of the United States. It is my opinion that when Congress used the word "State" in the statute herein involved it meant "State" within the constitutional sense, that is, a State of the Union.[3]

The comment of Assistant Attorney General Miller before the House Judiciary Committee referred to above that the "Irish Sweepstakes" would be included within the prohibitive section of the statute clearly shows that there was no intention to include foreign countries within the exception contained in 18 U.S.C. § 1953(b) (2).

The best answer to defendants' contention, it seems to me, is found in this Act, 18 U.S.C. § 1953(c), to wit,

"(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of

3. An examination of many statutes enacted by Congress dealing with affairs, commerce and transportation between States clearly indicates that whenever Congress intends the word "State" to mean something more than its constitutional meaning the meaning to be given the use of the word is expressly set forth, as for example,—

4 U.S.C. § 111. Compacts between States for cooperation in prevention of crime; etc.

"(a) The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime * * *.

"(b) For the purpose of this section, the term 'States' means the several States and Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam and the District of Columbia."

5 U.S.C. § 118k–2. (Hatch Act). "As used in this Act, the term 'State' means any State, Territory, or possession of the United States."

5 U.S.C. § 2191 Note. "State. Section 2(c) of Pub.L. 87–389, Oct. 4, 1961, 75 Stat. 820, provided that: 'For the purposes of the Federal Voting Assistance Act of 1955 (69 Stat. 584) * * * the word "State" shall be deemed to include the District of Columbia.' "

7 U.S.C. § 147a. Control and eradication of pests, etc. "(a) * * * As used in this section, the term 'State' includes the District of Columbia and the Territories and possessions of the United States."

7 U.S.C. § 183. Packers and Stockyards Act. " * * * For the purpose of this section the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nation."

7 U.S.C. § 361a. Agricultural Experiment Stations. " * * * As used in * * *, the terms 'State' or 'States' are defined to include the several States, Alaska, Hawaii, and Puerto Rico. * * * "

7 U.S.C. § 511(i). Tobacco Inspection. " * * * For the purpose of this paragraph the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nations."

7 U.S.C. § 610(j). Agricultural Adjustment. " * * * As used herein, the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nations."

7 U.S.C. § 1301(a) (6). Agricultural Adjustment Act. "The term 'State' includes a Territory and the District of Columbia and Puerto Rico."

18 U.S.C. § 591. Elections and Political Activities. "The term 'State' includes Territory and possession of the United States."

18 U.S.C. § 831. " 'Interstate and foreign commerce' means commerce between a point in one State and a point in another State, between points in the same State through another State or through a foreign country, between points in a foreign country or countries through the United States, and commerce between a point in the United States and a point in a foreign country or in a Territory or possession of the United States, but only insofar as such commerce takes place in the United States. The term 'United States' means all the States and the District of Columbia."

**280**

any State, Commonwealth of Puerto Rico, territory, possession, or the District of Columbia."

There can be no doubt as to the congressional intent here, foreign countries were not included within the exception.

I conclude that the Government has met its burden of proving beyond a reasonable doubt that defendants, Baker and Gates, are both guilty of the crime charged.

I also conclude that the transportation of the betting materials do not come within an exception of the statute.

### ORDER

Now, April 30, 1965, in accordance with Opinion this day filed, It is hereby Ordered and Decreed that,

(1) Motion of defendants, Murray B. Baker and Victor O. Gates, Sr., to suppress be and the same is hereby denied.

(2) Motion of defendants, Murray B. Baker and Victor O. Gates, Sr., for acquittal be and the same is hereby denied.

(3) I find defendant, Murray B. Baker, guilty as charged on Counts I, II and III.

(4) I find defendant, Victor O. Gates, Sr., guilty as charged on Counts I, II and III.