**UNITED STATES of America**

v.

**Michael NORBERTO, Robin Hansson, and Christine Forsythe, Defendants.**

**No. 04 CR 328(ADS)(ARL).**

United States District Court, E.D. New York.

June 15, 2005.

See, also, 2005 WL 1400277.

Roslynn R. Mauskopf, United States Attorney, by Geoffrey R. Kaiser, Assistant

United States Attorney, Central Islip, NY, for U.S.

Morvillo, Abramowitz, Grand, Iason & Silberberg P.C., New York City (Robert J. Anello, Richard F. Albert, Richard C. Tarlowe, of Counsel), for Michael Norberto.

Jeffrey W. Waller, LLC, Hauppauge, NY (Jeffrey W. Waller, Of Counsel), for Christine Forsythe.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case involves allegations that the defendants Michael Norberto ("Norberto"), Christine Forsythe ("Forsythe"), and Robin Hansson ("Hansson"), collectively (the "Defendants"), operated an illegal gambling enterprise in the United States that sold shares in a lottery conducted by the Government of Spain to customers around the world. On January 21, 2005, Hansson pleaded guilty to the second count in the indictment which charged the Defendants with a money laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(A).

Presently before the Court are motions by Norberto and Forsythe pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure seeking an order dismissing the Indictment in its entirety.

## I. BACKGROUND

For purposes of this motion, unless otherwise stated, the allegations in the Indictment are deemed to be true. *See United States v. Velastegui*, 199 F.3d 590, 592 n. 2 (2d Cir.1999). The Court will now review the allegations in the indictment.

In or about and between 1991 and September 2002, the Defendants allegedly operated an illegal gambling enterprise in the United States that sold shares in a lottery conducted by the Government of Spain to customers around the world. The Indictment alleges that this operation was facilitated through a "complex web of companies controlled by the defendants and their coconspirators" and that these corporate entities were utilized to conceal the existence of the criminal enterprise and launder the proceeds.

### A. The Parties and Relevant Entities

With regard to the Defendants and the relevant companies, it is alleged that Norberto owned Package Fulfillment Center, Inc. ("PFC") and Tech Mailing Services, Inc. ("Tech Mailing"), both located in Bohemia, New York. Hansson was the President and Chief Executive Officer of Profile Direct, Inc. ("Profile Direct"), a New York corporation, and Value Stores, Inc. ("Value Stores"), a Delaware corporation. Both Profile Direct and Value Stores were located in Bohemia, New York. Forsythe was the President and Chief Executive Officer of CF International Marketing, Inc. ("CFI"), a New York corporation. The Indictment also alleges that the Defendants utilized various entities in Curacao, Canada, and Australia to process payments by the customers of the operation.

### B. The Lottery

Each December, the Government of Spain conducted an annual lottery drawing called "El Navidad." The top prize in the drawing is called "El Gordo," meaning the "Fat One." Tickets were sold to the public through official lottery offices in Spain. Each ticket entitled the holder to a chance of winning a share of the El Navidad prizes. Although the rules and regulations of El Navidad prohibited individuals from taking tickets outside the country, it is undisputed that this lottery is played by people throughout Europe and around the world. As noted in *The Irish Times:*

Almost three-quarters of the tickets [from the 2004 lottery] went to outsiders, and this year for the first time Sort, [a small Pyrennean village whose name means "lucky" in Catalan], went onto the internet. Hopeful punters from the United States, Japan, Germany, France or Italy as well as many other parts of Spain, purchased their tickets on line spreading the millions around the globe....

(12/23/04 Ir. Times 9, 2004 WL 104002722, "Lucky little village Sort lives up to its name in big lottery.").

## C. The Test Mailings and the Alleged Scheme

In or about 1991 and 1992, co-conspirators John Does # 1, # 2, and # 3, along with others, conducted "test mailings" in Europe consisting of solicitations ("Lottery Solicitations") to purchase chances, shares, and interests in the El Navidad Lottery, which was referred to in promotional materials as the "El Gordo Lottery" ("El Gordo Interests"). These test mailings were allegedly conducted to determine the profitability of soliciting the purchase of El Gordo Interests outside of Spain.

Following the test mailings, John Doe # 1, John Doe # 2, and John Doe # 3, together with others, set up two organizations to conduct mass mailings of Lottery Solicitations for the purchase of El Gordo interests. One of these organizations was based in the United States (the "U.S. Operation") and offered El Gordo interests under promotional names, including Worldwide Lottery Commission (the "WLC Promotion"). The second organization was based in Canada (the "Canadian Operation") and offered El Gordo interests under promotional names including Transworld Lottery Commission (the "TLC Promotion.").

The Indictment alleges that between August 1993 and May 1999, the U.S. Operation was directed and supervised by Norberto and Hansson. Beginning in or about 1999, the U.S. Operation was also directed and supervised by Forsythe. According to the Indictment, these individuals, through Profile Direct, Value Stores and CFI, caused the Lottery Solicitations to be sent worldwide to individuals, exclusive of United States residents, allegedly in violation of laws prohibiting the importation and transportation of lottery tickets and other shares and interests in lotteries.

The Indictment further alleges that in order to avoid detection and minimize the impact of potential law enforcement seizures of Lottery Solicitations and related mailings to and from their customers, including customer payments and mailings acknowledging receipt of payment (collectively, "Lottery Mailings"), and to facilitate participation in the gambling operation, the Defendants and others allegedly: (1) used multiple vendors in the United States to print the Lottery Mailings and to forward them to different foreign locations for distribution; (2) contracted with multiple. commercial mail receiving agencies in the United States and abroad, including Mail Boxes, Etc., and Packaging Plus, to secure locations and addresses for the receipt of responses and remittances to the Lottery Solicitations; and (3) included in the Lottery Solicitations facsimile numbers associated with Value Stores located in Bohemia, New York and entities in Australia and Canada to which credit card payments could be submitted for participation in the gambling operation.

To further conceal the fact that they were operating an illegal gambling enterprise in the United States, the Indictment alleges that the Defendants falsely represented that they and the companies they directed, namely Profile Direct, Value

Stores, and CFI, were acting as "agents" on behalf of an off-shore marketing company named International Marketing Center, Inc. ("IMC"), located in Curacao. It is further alleged that the Defendants disguised the proceeds of their enterprise as royalty payments, consulting fees, and commissions paid to them from IMC.

The Defendants also used Pacific Network Services, Ltd. ("PNS"), a Canadian entity, to process checks and money orders submitted for purchase of El Gordo Interests. They also contracted with two Australian companies, namely USA Credit Card Services, Inc. ("USA Credit") and Terry Morris International, Inc. ("Morris International"), to collect the credit card authorizations received from the U.S. Operation by facsimile and mail.

The Indictment alleges that in or about and between November 1994 and December 1999, the U.S. Operation collected over $16 million from customer responses mailed as part of the WLC Promotion.

**D. The Wire Transfers**

The Indictment further alleges that between November 1994 and December 1999, PNS collected more than $4.7 million from the U.S. Operation. Hansson and Forsythe caused wire transfers from the PNS Account in Canada to the Value Stores Account in an amount exceeding $4.7 million.

During that same time, USA Credit collected more than $9 million from the U.S. Operation. Hansson and Forsythe subsequently caused wire transfers from the USA Credit Account of more than $4.6 million to various accounts held by companies operated and controlled by Norberto.

From December 1997 until December 1999, Morris International collected approximately $2.6 million from the U.S. Operation. Hansson and Forsythe allegedly caused wire transfers from the Morris International Account in an amount of over $900,000 to various accounts held by companies operated and controlled by Norberto, including accounts held by Value Stores, CFI, and Tech Mailing.

On April 6, 2004, a forty count Indictment was filed. Count One of the Indictment alleges a conspiracy to transport and mail lottery materials in violation of 18 U.S.C. §§ 1301, 1302, 1952(a)(3), and 1953(a); Count Two alleges a money laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(A); Counts Three through Twenty One allege international money laundering with respect to transfers from PNS to accounts held by Value Stores and CFI in violation of 18 U.S.C. § 1956(a)(2)(A); Counts Twenty–Two through Twenty–Six allege international money laundering with respect to transfers from USA Credit to accounts held by CFI and Tech Mailing in violation of 18 U.S.C. § 1956(a)(2)(A); and Counts Twenty–Seven through Forty allege international money laundering with respect to transfers from Morris International to accounts held by Tech Mailing, PFC, Value Stores and CFI in violation of 18 U.S.C. § 1956(a)(2)(A).

## II. DISCUSSION

**A. Count One—Conspiracy to Transport and Mail Lottery Materials in violation of 18 U.S.C. §§ 1301, 1302, 1952(a)(3), and 1953(a).**

Count One of the Indictment alleges a "Conspiracy to Transport and Mail Lottery Materials" in violation of 18 U.S.C. §§ 1301, 1302, 1952(a)(3) and 1953(a).

**1. As to Sections 1301, 1302 and 1953(a).**

 The Defendants first contend that the 1979 statutory amendments of 18

U.S.C. §§ 1307(b)(2) and 1953(b)(5) shield them from liability under Sections 1301, 1302 and 1953(a) because these subsections exempt the activities alleged in the indictment.

Section 1301 prohibits "mailing or otherwise sending not only actual foreign lottery tickets but any paper purporting to represent the tickets or interests in such tickets." *Federal Trade Commission v. World Media Brokers, Inc.,* No. 02 Civ. 6985, 2004 WL 432475, at * 7 (N.D.Ill. Mar.2, 2004.); 18 U.S.C. § 1301. In particular, this section makes unlawful whoever:

> [B]ring[s] into the United States for the purpose of disposing of the same, or knowingly deposits with any express company or other common carrier for carriage, or carries in interstate or foreign commerce any paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any advertisement of, or list of the prizes drawn or awarded by means of, any such lottery, gift, enterprise, or similar scheme; or, being engaged in the business of procuring for a person in 1 State such a ticket, chance, share, or interest in a lottery, gift, enterprise or similar scheme conducted by another State (unless that business is permitted under an agreement between the States in question or appropriate authorities of those States), knowingly transmits in interstate or foreign commerce information to be used for the purpose of procuring such a ticket, chance, share, or interest; or knowingly takes or receives any such paper, certificate, instrument, advertisement, or list so brought, deposited, or transported, shall be fined under

this title or imprisoned not more than two years, or both.

18 U.S.C. § 1301.

Similarly, section 1302, applies to one who "knowingly deposits in the mail, or sends or delivers by mail" certain lottery materials, including:

> Any letter, package, postal card, or circular concerning any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance;

> Any lottery ticket or part thereof, or paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, · or similar scheme offering prizes dependent in whole or in part upon lot or chance;

> Any check, draft, bill, money, postal note, or money order, for the purchase of any ticket or part thereof, or of any share or chance in any such lottery, gift enterprise, or scheme;

> Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, or containing any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes;

> Any article described in section 1953 of this title [which includes "wagering paraphernalia" such as "any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in . . . (c) in a num-

bers, policy, bolita, or similar game." (18 U.S.C. § 1953)].

18 U.S.C. § 1302.

The Defendants do not dispute the fact that the Lottery Solicitations were not intended for use in a lottery conducted or run by the foreign country to which the Lottery Solicitations were sent. Rather, the Lottery Solicitations were intended to solicit the purchase of lottery tickets of *another* foreign country, namely Spain. However, in support of their motion to dismiss, the Defendants argue that the statutory exceptions to Sections 1301, 1302, and 1953(a) that concern the transportation or mailing to an addressee within a foreign country, namely 18 U.S.C. §§ 1307(b)(2) and 1953(b)(5), render the charged conduct lawful.

Section 1307(b)(2) states in pertinent part:

> The provisions of sections 1301, 1302, and 1303 shall not apply to the transportation or mailing ... to an addressee within a foreign country of equipment, tickets, or material designed to be used within that foreign country in a lottery which is authorized by the law of that foreign country.

Section 1953(b)(5) mirrors this language and states that "[Section 1953(a)] shall not apply to ... the transportation in foreign commerce to a destination in a foreign country of equipment, tickets, or materials designed to be used within that foreign country in a lottery which is authorized by the laws of that foreign country."

The Defendants contend that because the Lottery Solicitations "were 'designed to be used within the foreign countr[ies]' to which they are sent," Norberto Mem. in Sup. at 10, the statutory exceptions found in Sections 1307(b)(2) and 1953(b)(5) preclude liability. The validity of this argument hinges on the definition and inter-pretation of the word "authorized." The Defendants argue that in the context of these exceptions, the word "authorized," makes it lawful to send lottery materials to a foreign country that permits lotteries in general, and/or permits its citizens to play the lotteries of another country. On the other hand, the Government takes a much narrower view of "authorize" and interprets it to only apply to situations where the foreign country itself runs, conducts, or administers the lottery for which the solicitations are sold.

Recently, in *Andersen LLP v. United States,* —— U.S. ——, 125 S.Ct. 2129, —— L.Ed.2d —— (2005), the Supreme Court reiterated the fundamental rule of statutory interpretation of a federal criminal statute:

> We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in the language that the common world will understand, of what the law intends to do if a certain line is passed.

*Andersen v. United States,* 125 S.Ct. at 2134 (internal quotations and citations omitted). Furthermore, in *Andersen* the Supreme Court advised that statutes must be "simply interpret[ed] ... as written." *Id.* at 2135; *see also Porcelli v. United States,* 404 F.3d 157, 163 (2d Cir.2005) ("[P]enal statutes ought to be construed in accordance with their plain meaning, so that the least sophisticated citizen may read the statute and regulate his or her conduct consistently therewith.").

Here, because Congress provided no definition of the word "authorize," the Court must consider the "ordinary, common-sense meaning of the word[ ]." *United States v. Dauray,* 215 F.3d 257, 260 (2d Cir.2000); *Andersen,* 125 S.Ct. at 2135. In

that regard, the Supreme Court advised that "the natural meaning of [the term in question] provides a clear answer." *Id.* To find the "natural meaning" of a word or term, the Court must look to sources such as the standard widely accepted law dictionary as the Supreme Court did in *Andersen.* According to Black's Law Dictionary 143 (8th ed.2004), the word "authorize" means "[t]o give legal authority; to empower [or][t]o formally approve; to sanction." Similarly, according to the American Heritage Dictionary of the English Language (2000), to "authorize" means "[t]o grant authority or power to. To give permission for; sanction;" and according to *Webster's Third New International Dictionary* 146–147 (unabridged ed.1993), "authorize" is defined as "to endorse, empower, ... or permit by or as if by some recognized or proper authority ... to endow with ... effective legal power...." Thus, the word "authorize" does not merely mean "to permit" or "to allow," as the Defendants contend. Rather, according to the plain meaning of the word "authorize" there must be an affirmative granting of formal approval or permission to allow the conduct in question.

Although the Defendants attempt to expand the scope of these exceptions to include material that is "designed to be used within the foreign countr[ies] to which they are sent," Norberto Mem. in Sup. at 10, a plain reading of the relevant language reveals that the exception is limited to "material, equipment, or tickets ... [that are] designed to be used within that foreign country *in a lottery which is authorized by the law of that foreign country.*" 18 U.S.C. §§ 1307(b)(2) and 1953(b)(5). The language *"that* foreign country" indicates that in order for the mailing and/or transportation of the Lottery Solicitations to be lawful, they must be designed to be used for the lottery that is "formally approved" by the country to which the shipment of lottery material, equipment, or tickets was sent. At this juncture, in this case, there is nothing in the record to indicate that any of the countries to which the Defendants sent the Lottery Solicitations has statutes authorizing or "giv[ing] legal authority" to participate in lotteries administered by Spain.

The Defendants also argue that if Congress had intended that the exceptions in Sections 1307(b)(2) and 1953(b)(5) were limited to lottery materials that are sent to a foreign country to be used in a lottery conducted or formally authorized by that country, it could have used the same language found in Section 1307(b)(1) which applies to "the transportation or mailing ... to addresses within a State of equipment, tickets, or material concerning a lottery which is *conducted* by that State acting under the authority of State law." (emphasis added); *see also* 18 U.S.C. § 1953(b)(4). The Court acknowledges that "[a] statute is to be considered in all its parts when construing any one of them." *United States v. Dauray,* 215 F.3d 257, 262 (2d Cir.2000) (internal quotation and citation omitted). However, the Court finds that there is a logical explanation for the different language in the subsections that apply to the States compared with the subsections that apply to foreign countries. Unlike the States which almost always conduct and/or administer their own State Lotteries, *see,* e.g., N.Y. Const, art. 1 § 9 ("[n]o lottery or the sale of lottery tickets ... or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature ... shall hereafter be authorized or allowed within this state ...."), such is not the case for foreign countries. For example, unlike the State of New York which has a state run lottery, the

United Kingdom *authorizes* a private company known as "Camelot" to be the government sanctioned operator of its National Lottery. *See About Camelot: Camelot and The National Lottery*, at h ttp://www.camelotgroup.co.uk/about/cam—lott.jsp. Similarly, in Australia, the New South Wales ("NSW") Lotteries Corporation is owned by the NSW Government and is licensed to conduct various lottery games. *See About NSW Lotteries, at* **http://www.nswlotteries.com.au/about/index.html**. Thus, when considering the lottery practices of foreign countries, it is not always the case that the lottery is conducted by the government of the foreign country. Indeed, the different terms used in the otherwise similar subsections are logical under the circumstances and in effect rebut the Defendants' argument in that regard.

Finally, the Court notes that with regard to Section 1307, the Second Circuit has expressly stated, although in a footnote and in dicta, that the purpose of this section "was to allow United States *manufacturers* to export lottery-related materials for use in foreign countries … not to attract players to ongoing lotteries." *United States Postal Service v. C.E.C. Services*, 869 F.2d 184, 186 n. 1 (2d Cir.1989) (emphasis added) (internal citation omitted). In addition, although consideration of a statute's legislative history is a matter of last resort and is only considered "[w]hen the plain language and canons of statutory interpretation fail to resolve statutory ambiguity," the Court cannot ignore the legislative history of these sections which support the Court's determinations. The legislative "Statement" in support of these exceptions is particularly instructive as to its purpose, and states in part:

> The Subcommittee on Administrative Law and Governmental Relations held a hearing on H.R. 1301. Testimony at the hearing [on H.R. 1301] established that

today, if a United States company wishes to sell lottery related materials to a foreign country, such as England, which has laws authorizing lotteries, the company must go to that country and set up a plant there. It cannot manufacture the materials here and ship them to the purchasing country. As amended, this bill is intended to alleviate this situation and allow for such shipments from the United States.

*Id.* Thus, it is not clear whether the exceptions in Sections 1307(b)(2) and 1953(b)(5) even apply to the Lottery Solicitations.

Accordingly, for the reasons stated above, the Court finds that the statutory exceptions found in sections 1307(b)(2) and 1953(b)(5) do not preclude criminal liability under sections 1301, 1302 and 1953(a) and the motion to dismiss the allegations relating to Sections 1301, 1302 and 1953(a) based on these exceptions is denied.

## 2. As to the Applicability of Section 1302.

 The Defendants next argue that Section 1302 does not apply to the conduct in question because there are no allegations that the United States mail was used to carry out the conspiracy. In support of their argument, the Defendants point to language in the Indictment that states that the Defendants "caused the Lottery Solicitations to be *sent* worldwide to individuals, exclusive of United States residents" and to language in the Bill of Particulars stating that the "means by which [the Lottery Solicitations] were sent *included* trucking, air freight and foreign mail." Bill of Particulars, at ¶ G.

Even assuming that the United States mail was not used to send the Lottery Solicitations, Section 1302 also makes it unlawful to mail "[a]ny check, draft, bill, money, postal note, or money order, for

the purchase of any ticket or part thereof, or of any share or chance in any such lottery, gift enterprise, or scheme."

Here, the Indictment alleges that the Defendants *"contracted with multiple commercial mail receiving agencies in the United States and abroad, to secure locations and addresses for the receipt of responses and remittances to the Lottery Solicitations,"* Indictment ¶ 12 (emphasis added), and that "[b]etween November 1994 and December 1999, the U.S. Operation collected over $16 million from responses to the Lottery Solicitations *mailed* as part of the WLC Promotion." *Id.* at ¶ 16 (emphasis added). Thus, the Indictment does allege that the United States mail was used in furtherance of the scheme.

Even if the Defendants did not directly place the "responses and remittances" in the mail, a principal is "anyone who 'causes an act to be done, which if directly performed by him would be an offense against the United States.' and makes him punishable as such." 18 U.S.C. § 2(b); *see also United States v. Dunne,* 99 F.Supp. 196, 198 (E.D.Pa.1951) (Holding that the defendant was properly indicted and convicted for "knowingly caus[ing] [a letter concerning a lottery] to be mailed to him."). In the Court's view, given the nature of the Lottery Solicitations and the fact that the Defendants are alleged to have contracted with commercial mail receiving agencies in the United States, namely "Mail Boxes Etc." and "Packing Plus" to "secure locations and address for the receipt of responses and remittances to the Lottery Solicitations," Indictment, at ¶ 12, the Indictment sufficiently alleges a violation of Section 1302. Accordingly, the motion to dismiss on the ground that there are no allegations that the United States mail was used to carry out the scheme, is denied.

## 3. As to Section 1953(a).

■ The Defendants move to dismiss the charges brought pursuant to 18 U.S.C. § 1953(a). Section 1953(a) provides:

Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in ... (c) a numbers, policy, bolita, or similar game shall be [guilty of a crime].

In particular, the Defendants argue that there cannot be a violation of this section because the Lottery Solicitations in question were not to be used in a "numbers, policy, bolita, or similar game," because this subsection does not expressly include lotteries. In support of this contention, Norberto primarily relies on dicta from *Schwartz v. Upper Deck Co.,* in which the Southern District of California, in a footnote, stated that section 1953 does not apply to lotteries because "lotteries are not mentioned [in § 1953(a)(c)], as they are in similar language in 18 U.S.C. § 1955(b)(2). 183 F.R.D. 672, 678 n. 6 (S.D.Cal.1999). On the principle of *expressio unius, exclusio alterius,* § 1953 is not applicable to lotteries." However, *Schwartz* fails to reconcile the above mentioned statement with the Supreme Court's holding in *United States v. Fabrizio,* 385 U.S. 263, 269, 87 S.Ct. 457, 17 L.Ed.2d 351 (1966):

It is clear that the lottery statutes apply to state operated as well as illegal lotteries and that § 1953 was introduced to strengthen those statutes by closing the loopholes placed in them by the narrow interpretation of included materials by this Court in *France v. United States,* 164 U.S. 676, 17 S.Ct. 219, 41 L.Ed. 595 and *Francis v. United States,* 188 U.S.

375, 23 S.Ct. 334, 47 L.Ed. 508. It would be anomalous to hold that where Congress meant to bar the lottery tickets themselves from interstate commerce it would allow the free circulation of other paraphernalia of the lottery. *Fabrizio*, 385 U.S. at 269, 87 S.Ct. 457; *See also United States v. Baker*, 241 F.Supp. 272, 277 (D.M.Pa.1965) (" 'There is no doubt but that the clear Congressional intent was to include all types of lottery schemes within the purview of the statute as embraced in the words "numbers, policy, bolita, or similar game." ' ") *aff'd.* 364 F.2d 107, 112 (3d Cir.1966) ("[W]e think there are similarities, taking into account the way the numbers game is played, between the lottery in question and policy. . . ."); *United States v. Stuebben*, 799 F.2d 225, 227 (5th Cir.1986) (upholding a conviction of a defendant who ran a company which purchased Illinois State Lottery tickets for customers residing in Louisiana, and in the course of business, used interstate commerce to transport betting slips to Chicago).

In addition, the Court finds that the fact that Section 1953(b)(5) specifically excludes "the transportation in foreign commerce to a destination in a foreign country of equipment, tickets, or materials designed to be used within that foreign country in a *lottery* which is authorized by the laws of that foreign country" from the coverage of this statute further evidences Congressional intent to include lotteries within the meaning of 18 U.S.C. § 1953(a). Thus, the Court finds that Section 1953(a)(c) encompasses lotteries.

This holding is supported by the legislative history of Section 1953(c) which states:

This bill is designed to prevent the easy interstate transportation of wagering paraphernalia. Federal laws which are designed to suppress traffic in lottery tickets in interstate or foreign commerce have been on the statute books since 1895 (18 U.S.C., secs. 1301, 1305). These statutes make illegal the transportation in interstate or foreign commerce of "any paper, certificate or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery . . ."

. . . . .

Under the proposed bill, it would be a felony to send or carry knowingly in interstate or foreign commerce any wagering paraphernalia or device adapted or designed for use in bookmaking, wagering pools with respect to a sporting event, or numbers, policy, bolita, or similar game. The violation carries with it a penalty of a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. *The language of the proposal make[s] clear that it will include slips, papers, or paraphernalia which may be used in a lottery scheme not yet in existence or already completed.* It also bans the interstate transportation of slips recording the accounts and numbers bet in a numbers lottery and betting slips and other material utilized in a bookmaking operation. The game known as bingo does not come within the scope of this bill, however.

United States Code Congressional and Administrative News, Vol. 2, 87th Congress, First Session, at 2635 (emphasis added).

The Supreme Court's statement in *Erlenbaugh v. United States*, is not inapposite. In that case the Supreme Court stated that

Section 1953 has a narrow, specific function. It erects a substantial barrier to the distribution of certain materials used in the conduct of various forms of illegal gambling. By interdicting the flow of

these materials to and between illegal gambling businesses, the statute purposefully seeks to impede the operation of such businesses.

409 U.S. 239, 242, 93 S.Ct. 477, 34 L.Ed.2d 446, 93 S.Ct. 477 (1972).

Again, the Defendants attempt to argue that because the sale of the Lottery Solicitations does not violate the laws in the foreign country in which they are sold, there is no "illegal gambling business." However, the Court notes that the scheme in question may be considered an "illegal gambling business" on the basis that it violates New York State law and/or laws of the United States, namely 18 U.S.C. §§ 1301 and 1302, among others statutes, and/or the laws of foreign countries. *See, e.g.,* Criminal Code of Canada, Part VII Disorderly Houses, Gaming and Betting, R.S.C.1985, ch. C-46, § 206 (Making illegal the "sale or offer for sale of any ticket, chance or share, in any such [foreign] lottery....").

Finally, the Defendants argue that even if section 1953 is held to include lotteries, because the Defendants are alleged to have only offered foreign consumers the opportunity to participate in an existing state-sponsored lottery in Spain, they were not *conducting* a lottery. The Defendants cite *United Postal Serv. v. Amada,* 200 F.3d 647 (9th Cir.2000) and *Pic–A–State Pa, Inc. v. Pennsylvania,* No. 93 Civ. 0814, 1993 WL 325539, at *3 (M.D.Pa.1993) *rev'd on other grds.* 42 F.3d 175 (3d Cir.1994) in support of this argument.

However, both of these cases are distinguishable from the case at bar. The *Amada* defendants were prosecuted under the provisions of 39 U.S.C. § 3005 which prohibits mailings where the person is "conducting" an illegal private lottery. The issue in *Amada* was whether the defendants operated and/or conducted a lottery. *Id.* at 651. Similarly, the court in *Pic–A–*

*State Pa* was charged with determining whether the plaintiff, which operated a lottery ticket-ordering business through wire communications rather than via "tangible objects," was engaged in "the business of wagering and betting" as defined in 18 U.S.C. § 1084. *Pic–A–State Pa.,* 1993 WL 325539, at *3. *Amada* and *Pic–A–State* are distinguishable from the case at bar because, unlike 39 U.S.C. § 3005 and 18 U.S.C. § 1084, for purposes of Section 1953(a), it is irrelevant whether the Defendants were actually "conducting" the lottery or "in the business of wagering and betting." Rather the relevant inquiry is whether the Lottery Solicitations were "used, or to be used, or adapted, devised, or designed for use in ... a numbers policy, bolita, or similar game." 18 U.S.C. § 1953.

Accordingly, the motion to dismiss the charges based on section 1953 is denied.

**4. As to the Applicability of Section 1952(a)(3)**

■ The Defendants are also charged with violating the Travel Act, 18 U.S.C. § 1952(a)(3). This section makes unlawful

Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to ... otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity....

Section 1952(b) defines "unlawful activity" in part, as "any business involving gambling ... in violation of the laws of the State in which they are committed or of the United States."

The Defendants argues that the Indictment is deficient because it does not identify or specify the alleged state law violation and it merely alleges that the unlawful

activity is "a gambling enterprise in violation of the laws of the State of New York and the United States." An indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." The fact that the Indictment does not specify the exact State and/or Federal Law that serves as the predicate for liability under this statute does not in and of itself warrant its dismissal. It is well-settled that "[a]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events . . . ." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992).

The Defendants place great reliance on *U.S. v. Miller*, 774 F.2d 883 (8th Cir.1985), a case addressing a different criminal statute, namely 18 U.S.C. § 1955, where the conviction was reversed because "an allegation that some state statute has been violated does not fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." (internal quotations omitted).

However, "[u]nder *Miller*, a charge . . . will be dismissed only if the count fails to give a sufficient description of the activities forming the basis for the charge *and* the count lacks any citation to the underlying state statute." *See United States v. Gotti*, No. 02 Cr. 606, 2003 WL 124148, at * 3 (Jan. 15, 2003) (citing *Miller*, 774 F.2d at 885–86). In addition, "the prejudice rule also applies with equal force when considering [omissions in citations of the substantive federal crime] with respect to citations of state or federal law statutes which serve as a predicate act for the substantive federal offense." *United States v. Giampa*, No. 92 Cr. 437, 1992 WL 322028, at * 3 (S.D.N.Y. Oct.29, 1992).

Unlike the indictment discussed in *Miller*, the indictment in this case gives the Defendants "a sufficient description of the activities forming the basis of the charge." *Gotti*, 2003 WL 124148, at *1; *see also Giampa*, 1992 WL 322028 (S.D.N.Y. Oct.29, 1992) ("The unlawful activity [i.e. the conspiracy to assault and threaten to commit a crime of violence] which constituted the violation of state law is set forth in the indictment and the failure to cite to sections of New York's Penal Law with respect to such illegal activity had no bearing on [the] defendant['s] . . . preparation for this case."). Therefore, in the Court's view, the Defendants have not demonstrated prejudice from the omission of the state citations in this case.

The Defendants next argue that "no unlawful" activity is alleged under the Travel Act because the charged conduct does not constitute gambling under Section 1952. In support of their argument, the Defendants again point to *United States Postal Service v. Amada*, 200 F.3d 647 (9th Cir. 2000). As stated above, the defendants in *Amada* were charged with violating a different statute, 39 U.S.C. § 3005, which prohibits mailings where the person is "conducting" an illegal private lottery. 18 U.S.C. § 1952(a)(3) does not have this same limitation of covered activity.

Thus, the Court finds that the Indictment properly alleges a violation of Section 1952(a)(3). Accordingly, the motion to dismiss the charges brought pursuant to this section is denied.

### B. As to Counts Two through Forty—The Money Laundering Counts

Count Two of the Indictment charges the Defendants with a money laundering conspiracy in violation of 18 U.S.C.

§§ 1956(a)(1)(A)(i) and (a)(2)(A). Counts Three through Forty allege that the Defendants engaged in various international money laundering schemes in violation of Section 1956(a)(2)(A). Section 1956(a)(2)(A) makes unlawful

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the united States to or through a place outside the United States or to a place in the United States from or through a place outside the United States ... with the intent to promote the carrying on of specified unlawful activity.

The Defendants seek the dismissal of Counts Two through Forty on the basis that the Government did not properly allege the specified unlawful activities underlying the money laundering, namely, 18 U.S.C. §§ 1952 and 1953. Because the Court has found that the Indictment properly alleges violations of Sections 1952 and 1953, the Defendants' motion to dismiss Counts Two through Forty is similarly denied.

### C. As to the Additional Contentions of Forsythe.

In addition to the above mentioned arguments, Forsythe sets forth the following additional contentions in support of her motion to dismiss. With respect to Count One, Forsythe argues: (1) that she may not be held criminally liable for alleged conduct of corporations which she is not alleged to have controlled; (2) that the Indictment fails to state a conspiracy to violate 18 U.S.C. §§ 1952 and 1953 because it does not allege that the underlying conduct is illegal; and (3) that the Section 1952 violation is deficient because it does not charge that she had the intent to violate a specific state law. As to Counts Two through Forty, Forsythe contends that: (1) the Indictment does not state any acts that can serve as a predicate for money laundering; (2) the Indictment does not sufficiently allege that she knew she received the proceeds of unlawful activity or intended to promote or carry on that activity.

Rule 7(c) of the Federal Rules of Criminal Procedure requires a criminal indictment to contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." For purposes of a motion to dismiss an indictment, the Court must treat the allegations in the indictment as true. *See United States v. Velastegui,* 199 F.3d 590, 592 n. 2 (2d Cir.1999). The Second Circuit has instructed that " '[a]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events....' " *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir. 1999) (quoting *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992)) (citations and internal quotation marks omitted).

The Court finds that the Indictment sets forth the alleged violations in sufficient detail and that there are no defects in the indictment against Forsythe that warrant dismissal. The Indictment includes specific acts committed by all of the Defendants, including Forsythe, in furtherance of the conspiracy charged in Count One. Furthermore, the Indictment sets forth the dates and amounts of each transaction relating to the money laundering counts.

An indictment need only track the language of the statute charged and state the approximate time and place of the alleged crime. *See United States v. Pirro,* 212 F.3d 86, 92 (2d Cir.2000) ("We have consistently upheld indictments that do little

more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal quotations and citations omitted). The Indictment in this case more than satisfies these requirements.

"Based on the role assumed by a faithful grand jury in the accusatory process, an indictment, if valid on its face, is enough to call for trial of the charges on the merits." *United States v. Labate*, No. S100CR632, 2001 WL 533714, at *10 (S.D.N.Y. May 18, 2001) (citations and quotations omitted). Accordingly, the motion by Forsythe to dismiss the Indictment on the grounds that it contains the above mentioned pleading deficiencies is denied.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the motions by Norberto and Forsythe to dismiss the Indictment are **DENIED** in their entirety.

**SO ORDERED.**