# Scope of Exemption Under Federal Lottery Statutes for Lotteries Conducted by a State Acting Under the Authority of State Law

The federal lottery statute exemption for lotteries "conducted by a State" requires that the state exercise actual control over all significant business decisions made by the lottery enterprise and retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property or essential assets of the state's lottery.

It is permissible under the exemption for a state to contract with private firms to provide goods and services necessary to enable the state to conduct its lottery, including management services, as discussed in the opinion.

October 16, 2008

MEMORANDUM OPINION FOR THE
ACTING ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

Federal law generally prohibits the promotion and advertisement of lotteries in interstate commerce, 18 U.S.C. §§ 1301–1304, 1953(a), but exempts from these prohibitions, among other things, lotteries "conducted by [a] State acting under the authority of State law." *Id.* §§ 1307(a)(1), 1307(b)(1), 1953(b)(4). We understand that a number of states have proposed to enter into contracts with private management companies for the long-term operation of their lotteries, pursuant to state legislation. Under the terms of these proposed arrangements, the private management company would operate the lottery business under standards established by the state, would make a fixed upfront or annual payment to the state representing a projection of profits from the lottery business, and would have some significant economic interest in the additional profits of the enterprise and would bear some significant portion of the risk of losses. The Criminal Division has asked us for guidance in determining whether a lottery operating under such a long-term private management arrangement would qualify as a lottery "conducted by a State acting under the authority of State law" within the meaning of the federal lottery statutes.

We conclude that the statutory exemption for lotteries "conducted by a State" requires that the state exercise actual control over all significant business decisions made by the lottery enterprise and retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property or essential assets of the state's lottery. It is permissible under the exemption for a state to contract with private firms to provide goods and services necessary to enable the state to conduct its lottery, including management services, as discussed herein.

## I.

State-chartered lotteries were prevalent during the colonial period and the early years of the Republic. In the nineteenth century, public sentiment shifted against gambling, and by the end of the century most states had banned lotteries of any sort, public or private. The State of Louisiana, however, continued to permit the Louisiana Lottery Company, a powerful private concern, to operate under a monopoly from the State. Largely unregulated by Louisiana, the Louisiana Lottery Company made significant profits by promoting and selling tickets to the citizens of other states where lotteries were illegal. *See generally* National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, Department of Justice, *The Development of the Law of Gambling 1776–1976* (1977) ("*DOJ Gambling Report*"); G. Robert Blakey & Harold A. Kurland, *The Development of the Federal Law of Gambling*, 63 Cornell L. Rev. 923, 927–38 (1978).

To stop this circumvention of other states' laws and to address the perceived evils of the Louisiana Lottery Company, including the corruption of government officials and other problems associated with the commercialization of gambling, Congress in the 1890s made it a crime to sell or advertise lotteries through the mail or through interstate commerce. *See* Act of Sept. 19, 1890, ch. 908, § 1, 26 Stat. 465 (codified as amended at 18 U.S.C. § 1302) (prohibiting the use of the mails for lottery-related purposes); Act of Mar. 2, 1895, ch. 191, § 1, 28 Stat. 963 (codified as amended at 18 U.S.C. §§ 1301) (prohibiting interstate traffic in lottery materials), 1303 (prohibiting mail carriers from participating in lottery activities). Congress subsequently extended these prohibitions to broadcast media and to a broader array of gambling activity. *See* Communications Act of 1934, Pub. L. No. 73-416, § 316, 48 Stat. 1064, 1088–89 (codified as amended at 18 U.S.C. § 1304) (prohibiting the broadcast of information concerning a lottery); Pub. L. No. 87-218, 75 Stat. 492 (1961) (amending Travel Act) (codified at 18 U.S.C. § 1953(a)) (prohibiting interstate transport of wagering paraphernalia). These prohibitions applied regardless of whether the lottery was run by a private entity or by a state. *United States v. Fabrizio*, 385 U.S. 263, 269 (1966).

Beginning with New Hampshire in 1963, a number of states decided to institute or reinstitute their own state-run lotteries to raise public funds. *DOJ Gambling Report* at 116–21; Blakey, *Federal Law of Gambling*, 63 Cornell L. Rev. at 950 & nn. 114–15. By the end of 1974, thirteen states were conducting their own lotteries. H.R. Rep. No. 93-1517, at 4 (1974) (Committee on the Judiciary). To accommodate the promotion of these state-run lotteries, Congress in 1975 enacted exemptions to the criminal prohibitions in 18 U.S.C. §§ 1301–1304 and 1953(a) for "lotter[ies] conducted by [a] State acting under the authority of State law." Pub. L. No. 93-583, §§ 1, 3, 88 Stat. 1916 (the "1975 Act") (codified as amended at 18 U.S.C. §§ 1307(a)(1), 1307(b)(1), 1953(b)(4)). An earlier version of the bill would have "permit[ted] the advertisement of any legal lottery, whether it is

conducted by the State or not," but at the urging of the Department of Justice, it was rejected in committee in favor of the more restrictive limitation quoted above.[1]

In 1988, Congress added an exemption to section 1307 for lotteries that are "authorized or not otherwise prohibited by the State in which [they are] conducted," if those lotteries are "conducted by a not-for-profit organization or a governmental organization" or "conducted as a promotional activity by a commercial organization and [are] clearly occasional and ancillary to the primary business of that organization." Pub. L. No. 100-625, § 2(a), 102 Stat. 3205 (codified at 18 U.S.C. § 1307(a)(2)). Again, Congress gave serious consideration to legislation that would have "remove[d] federal restrictions on the advertising of legitimate lotteries and gambling activities in interstate commerce, whether conducted by public, private, or charitable interests," but declined to adopt such a broad exemption.[2]

Today, forty states, as well as the District of Columbia, operate government-run lotteries.[3] Although lotteries conducted by for-profit companies remain subject to

---

[1] *State Conducted Lotteries: Hearing on H.R. 6668 and Companion Bills Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary*, 93d Cong. 3 (1974); *see also* H.R. Rep. No. 93-1517, at 8 (1974) (Committee on the Judiciary) ("When the subcommittee took favorable action on bill 6668 and reported it to the full committee it recommended a series of amendments which would have extended the exceptions in the bill to lotteries '. . . authorized and licensed in accordance with State law.' These amendments were rejected by the full committee, and are the amendments referred to in the statement of additional views appended to this report. The Justice Department opposed this series of amendments and, as has been noted, they were not accepted by the full committee and were not reported to the House.").

[2] H.R. Rep. No. 100-557, at 3 (1988); *see also id.* at 9 (noting that the bill "would [have] permit[ted] the advertising of 'state-authorized' lotteries, and not merely 'state-conducted' lotteries") (quoting testimony of Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, Department of Justice); 131 Cong. Rec. 25,508 (1985) (statement of Rep. Frank) (introducing earlier version of bill that would have exempted any lottery "authorized and regulated by the State in which it is conducted").

[3] *See* Ariz. Rev. Stat. Ann. §§ 5-501 to 5-525 (2002 & Supp. 2007); Cal. Gov't Code § 8880 (2005 & West Supp. 2008); Colo. Rev. Stat. §§ 24-35-201 to 24-35-222 (2006); Conn. Gen. Stat. §§ 12-800 to 12-834 (2000 & West Supp. 2008); Del. Code Ann. tit. XXIX, §§ 4801–4824 (2003 & Supp. 2006); D.C. Code §§ 3-1301 to 3-1337 (2007 & Supp. 2008); Fla. Stat. Ann. §§ 24.101–24.124 (2003 & West Supp. 2008); Ga. Code Ann. §§ 50-27-1 to 50-27-55 (2006); Idaho Code §§ 67-7401 to 67-7452 (2006 & Supp. 2008); 20 Ill Comp. Stat. Ann. §§ 1605/1–1605/27 (West 2008); Ind. Code Ann. §§ 4-30-1-1 to 4-30-19-4.2 (1996 & Lexis/Nexis Supp. 2008); Iowa Code § 99G (2004 & West 2008); Kan. Stat. Ann. §§ 74-8701 to 74-8721 (1992); Ky. Rev. Stat. Ann. §§ 154A.010–154A.990 (2006 & West 2007); La. Rev. Stat. Ann. §§ 47:9000–47:9081 (Supp. 2008); Me. Rev. Stat. Ann. tit. VIII, §§ 371–389 (1997 & Supp. 2007); Md. Code Ann., State Gov't §§ 9-101 to 9-125 (2004 & Lexis/Nexis Supp. 2007); Mass. Ann. Laws. ch. 10, §§ 22-35, 36-40, 56-58 (2000 & Lexis/Nexis Supp. 2008); Mich. Comp. Laws Ann. §§ 432.1–432.47 (2001 & West Supp. 2008); Minn. Stat. Ann. §§ 349A.01–349A.16 (2004 & West Supp. 2008); Mo. Rev. Stat. §§ 313.200–313.353 (2001 & West Supp. 2008); Mont. Code Ann. §§ 23-7-103 to 23-7-412 (2007); Neb. Rev. Stat. Ann. §§ 9-801 to 9-841 (2003 & Lexis/Nexis Supp. 2007); N.H. Rev. Stat. Ann. §§ 284-21-a to 284-21-v (Lexis/Nexis Supp. 2007); N.J. Stat. Ann. §§ 5-9-1 to 5-9-25 (1996 & West Supp. 2008); N.M. Stat. Ann. §§ 6-24-1 to 6-24-34 (2008); N.Y. Tax Law §§ 1600–1620 (2004 & McKinney Supp. 2008); N.C. Gen. Stat. §§ 18C-101 to 18C-172 (2007); N.D. Cent. Code §§ 53-12.1-03 to 53-12.1-10 (2007 & Supp. 2007); Ohio. Rev. Code Ann.

the criminal prohibitions in 18 U.S.C. §§ 1301–1304 and 1953(a), some states are considering legislation that would authorize long-term agreements with private management companies to operate lotteries for the states, subject to prescribed standards, in return for a significant share of the profits of the lottery enterprise. The Criminal Division has sought our views on whether lotteries operated under such arrangements would fall within the scope of the federal exemption for lotteries "conducted by a State acting under the authority of State law." The arrangements proposed by the states, as we understand them, would be authorized by state legislation, and the question comes down to whether lotteries so operated would be "conducted by" the states.[4]

## II.

For the reasons set forth herein, we believe that the statutory exemption for lotteries "conducted by a State" requires that the state manage and direct the course of the lottery venture—by exercising actual control over all significant business decisions made by the enterprise—and that the state retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property and assets essential to the state's lottery. As we discuss more fully below, preserving the state's ownership interests in the lottery business will help to ensure that the lottery will be operated *by* the state and solely *for* the public benefit of the state, which we believe the federal lottery statutes require. In our view, these requirements flow from the text and structure of the statutes, from their legislative history, and from relevant court decisions. In interpreting the scope of the exemption for lotteries "conducted by a State," we find that principles of agency and partnership law are instructive by analogy.

---

§§ 3770.01–3770.99 (2005 & Lexis/Nexis Supp. 2008); Okla. Stat. Ann. tit. 3A, §§ 701–735 (West Supp. 2008); Or. Rev. Stat. §§ 461.010 to 461.740 (2007); 72 Pa. Cons. Stat. §§ 3761-101 to 3761-314 (1995 & West 2008); R.I. Gen. Laws §§ 42-61-1 to 42-61-17 (2006); S.C. Code Ann. §§ 59-150-10 to 59-150-410 (2004 & Supp. 2007); S.D. Codified Laws §§ 42-7A-1 to 42-7A-65 (2004 & Supp. 2008); Tenn. Code Ann. §§ 4-51-101 to 4-51-206 (2005 & Supp. 2007); Tex. Gov't Code Ann. §§ 466.001 to 466.453 (2004 & Vernon Supp. 2008); Vt. Stat. Ann. tit. XXXI, §§ 651–678 (2000 & Supp. 2007); Va. Stat. Ann. §§ 58.1-4000 to 58.1-4027 (2004 & Supp. 2007); Wash. Rev. Code Ann. §§ 67.70.010 to 67.70.905 (2001 & Lexis/Nexis 2008); W. Va. Code §§ 29-22-1 to 29-22-28 (2004 & Lexis/Nexis Supp. 2008); Wis. Stat. Ann. §§ 565.01 to 565.50 (West 2006).

[4] Such a lottery would not appear to qualify under any other exemption to the federal lottery statutes. The private management company contemplated in the various state proposals would not be a "not-for-profit organization" for purposes of the exemption enumerated in 18 U.S.C. § 1307(a)(2)(A); nor would the lottery be managed "as a promotional activity" that "is clearly occasional and ancillary to the primary business of that organization," *id.* § 1307(a)(2)(B). Similarly, even if the private management company were to maintain a close working relationship with the state government, it would be highly unlikely to qualify as a "governmental organization" under section 1307(a)(2)(A). None of the remaining exemptions in sections 1307 and 1953(b) would have any conceivable application to a state-sponsored lottery. *See* 18 U.S.C. §§ 1307(b)(2), 1953(b)(1), (b)(3), (b)(5).

## A.

The verb "conduct" means "[t]o manage; direct; lead; have direction; carry on; regulate; do business." *Black's Law Dictionary* 295 (6th ed. 1990). *See Webster's Third New International Dictionary* 474 (1993) (defining verb "conduct" to mean "lead," "direct," "control," or "manage"); 2 *Oxford English Dictionary* 791 (1978) (similar). In the context of the federal lottery statutes, we believe the phrase "conducted by the State" contemplates that the state will "manage" the business, "direct" the affairs of the business, "carry on" its operations, and "do business" as a state-run enterprise, for the benefit of the state.

Although "regulate" is suggested in the dictionaries as one synonym for "conduct," merely regulating the lottery, or licensing a private lottery concession pursuant to detailed standards prescribed by the state, plainly cannot be sufficient to satisfy the requirements of the statutory exemption. That the exemption requires more than state regulation or licensing is confirmed by 18 U.S.C. § 1307 as a whole. The exemption for lotteries "conducted by a State" in section 1307(a)(1) is followed immediately in section 1307(a)(2) by the exemption for a lottery "authorized or not otherwise prohibited by the State in which it is conducted" and "conducted by" a "not-for-profit organization," a "governmental organization," or "as a promotional activity by a commercial organization" that is clearly occasional and ancillary to the business of the organization. Were the phrase "conducted by a State" construed to include lotteries authorized, licensed, or regulated by the state (for example, pursuant to state law and subject to state-imposed standards), the exemption in section 1307(a)(1) would swallow those separately enumerated in section 1307(a)(2), a result that is strongly disfavored as a matter of statutory interpretation. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 & n.11 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."). Furthermore, the parallel use of the phrase "conducted by" in section 1307(a)(2)'s exemptions for certain lotteries run by not-for-profit organizations and as occasional promotional activities by commercial organizations strongly suggest that "conducted by" cannot mean "regulated by," because not-for-profit organizations and commercial entities do not, in any conventional sense of the word, "regulate."

The only federal decision to address the meaning of the statutory exemption for lotteries "conducted by a State" is consistent with this reading. In *United States v. Norberto*, 373 F. Supp. 2d 150 (E.D.N.Y. 2005), the court considered whether the exemption in section 1307(b)(2) for lotteries "authorized by the law[s] of [a] foreign country" requires that the foreign country affirmatively approve the conduct in question. *See id.* at 156. The defendants objected to such a reading on the ground that it would essentially read into that exemption a requirement (paralleling section 1307(a)(1)) that the lottery be "conducted by" the foreign government. The court rejected this contention, on the ground that a state's

affirmative authorization of an activity was not equivalent to its conducting that activity. To make this point, the court contrasted "the State of New York which has a state run lottery" with "the United Kingdom[, which] authorizes a private company known as 'Camelot' to be the government sanctioned operator of its National Lottery." *Id.* at 156–57. Consistent with our conclusion here, the court indicated that the British arrangement—which the court understood to involve the use of a government-licensed and regulated management company to operate the lottery—would not qualify as a lottery conducted by a state. *Id.*[5]

The Rhode Island Supreme Court reached a similar conclusion in two advisory opinions addressing whether state lottery proposals were consistent with the Rhode Island Constitution's prohibition on gaming except where "operated by the state." R.I. Const. art. 6, § 15. The statutory proposals would have permitted a private gaming company and an Indian tribe to run a casino subject to close regulatory supervision by the state, and the court was asked to determine whether the proposed arrangements left the state with sufficient control to satisfy the requirements of the constitutional provision. Interpreting the word "operate" as we interpret "conduct" here (as entailing active control over the enterprise), the court held that the state must possess "the power to make decisions about *all aspects* of the functioning of [the] business enterprise." *In re Advisory Opinion to House of Representatives*, 885 A.2d 698, 706 (R.I. 2005) ("*Casino II*") (emphasis in original) (quoting *In re Advisory Opinion to Governor*, 856 A.2d 320, 331 (R.I. 2004) ("*Casino I*")). Thus, even though the state gaming commission would have had regulatory control over the casino under the proposal, and under one proposal would have had veto authority over certain decisions, the court found it disqualifying that "Harrah's would make day-to-day decisions having to do with the functioning of the proposed casino while the Lottery Commission merely would enforce the applicable regulations." *Casino I*, 856 A.2d at 331–32; *see also Casino II*, 885 A.2d at 707 ("Mere regulatory power over the most fundamental aspects of the gaming business—selection of the casino service provider—certainly falls short of 'operating' 'all aspects' of the facility.").

This interpretation of "operate"—as necessarily including "the power to make decisions about all aspects of the functioning of [the] business enterprise"—is consistent with our interpretation of the verb "conduct" in sections 1307 and 1953(b). The court concluded that the state had to have "actual control," which meant that it could not cede the power to "make day-to-day decisions having to do with the functioning of" the lottery. In addition, while ultimately concluding that the statutory proposal did not leave the state with sufficient authority to "operate" the lottery, the Rhode Island Supreme Court drew favorable attention to features of

---

[5] It is significant to note that while the British government regulates the activities of Camelot, the private company retains a substantial portion of the profits of the enterprise and is authorized to make business decisions for the lottery without the approval of the British government. *See* http://www. natlotcomm.gov.uk/UploadDocs/Contents/Documents/Final%20ITA-Full.pdf (last visited Aug. 5, 2008).

the proposal that "appear[ed] to vest operational control in the state." *Casino II*, 885 A.2d at 708. These features included the right of the state "to direct daily revenue," *id.* at 709; the responsibility of the gaming company to comply with detailed accounting procedures, *id.* at 709 & n.11; the right of the state to monitor all "gaming devices," *id.* at 710; the right of the state to set the number of video lottery terminals and non-slot table games to be played at the casino, *id.*; the right of the state to set the odds of winning, *id.*; and "all other powers necessary and proper to fully and effectively execute and administer the provisions of this chapter for its purpose of allowing the state to operate a casino gaming facility," *id.* at 711. Similarly here, a state's authority over these aspects of lottery operations would be important in establishing that it is "conducting" the lottery and therefore that the lottery is eligible for section 1307(a)(1)'s statutory exemption.

There is a question whether the statutory exemption would allow for an arrangement in which the state's lottery is conducted jointly by the state and by a private for-profit management company—in effect, through a partnership or joint venture between the state and the private company. It might be suggested that even if the private company participates in the conduct of the business, by exercising significant control over some business decisions and participating significantly in the profits and risks of the venture, the lottery could still be "conducted by the State" as long as the state participates in the joint conduct of the lottery. We do not believe, however, that that is the better reading of the statutes.

The overall structure of the statutory scheme strongly suggests that to qualify for the exemption the lottery must be conducted by the state and only by the state, not jointly by the state and a private for-profit entity. Section 1307(a) sets forth several parallel exemptions for lotteries that are "conducted by a State," "conducted by a not-for-profit organization or a governmental organization," or "conducted as a promotional activity by a commercial organization" where the lottery is clearly only occasional and ancillary to the business of the commercial organization. 18 U.S.C. §§ 1307(a)(1), 1307(a)(2). These various options are stated disjunctively in the statute; the statute does not appear to allow for an option whereby a lottery might be conducted jointly by more than one of these entities at the same time (though admittedly the statute does not expressly foreclose that possibility). The very narrow scope of the exemption for "clearly occasional and ancillary" "promotional" lotteries conducted by "commercial organization[s]" underscores the evident objective of the federal lottery prohibitions to prevent the broader commercial promotion of lotteries that serve the profit-making interests of private companies, as opposed to the public interests of state and local governments and charitable organizations.

This conclusion is strongly reinforced by the legislative history of the lottery statutes. Although enacted in phases over time, marking the evolving nature of interstate commerce, the federal lottery statutes as a whole reflect a consistent and focused policy by Congress to prohibit private for-profit concerns from engaging

in the promotion of lotteries and thereby to prevent recurrence of the perceived evils that were associated with the Louisiana Lottery Company. As explained by lawmakers at the time, the 1975 Act that created the exemption for state-conducted lotteries sought to accommodate the states' renewed interest in using lotteries to generate state revenue for the benefit of the public interest[6] while avoiding the risk of corruption and commercialization driven by private interests that Congress believed to be presented by privately operated lotteries, such as the Louisiana Lottery Company.[7] Indeed, the House Committee on the Judiciary considered a version of the 1975 Act, passed out of a subcommittee, that would have exempted any lottery "authorized and licensed in accordance with state law." H.R. Rep. No. 93-1517, at 8. A Department of Justice witness testified, however, that "the Department would not favor any change in the law which would have the effect of opening up the channels of commerce to individuals who would seize upon the existence of a State authorized lottery to 'commercialize the process,'" and the Committee subsequently amended the bill to exempt only lotteries that were

---

[6] *See* S. Rep. No. 93-1404, at 8 ("It is the recommendation of the Committee that the Federal Government should not allow its laws to impede or prevent the lawfully authorized efforts of States to raise revenues and benefit its own citizens"); 120 Cong. Rec. 22,145 (1974) (statement of Sen. Kennedy) ("State lotteries . . . are not operating for private gain, but to supplement revenue in order to support essential public services."); 120 Cong. Rec. 12,599 (1974) (statement of Rep. Rodino) ("I would like to point out that the revenue being derived from State authorized lotteries is being used for the purposes of education in many States. In some States it is being used to fund programs designed to serve the interests of the elderly."); *id.* at 12,600 (statement of Rep. Cohen) ("Since there is no overriding Federal interest in prohibiting State controlled lotteries, the Federal Government should not interfere with the sovereignty of the individual States or in their selection of revenue-raising measures."); *id.* at 12,604 (statement of Rep. Daniels) ("The lottery . . . is a painless means of raising much needed revenue").

[7] *See* 120 Cong. Rec. 12,601 (1974) (statement of Rep. Sarasin) (the 1890 anti-lottery acts were "intended to correct the abuses of a privately run illegal lottery," not to prevent "the situation which exists today, where the States use lotteries to fund such worthwhile programs as education, environmental research, programs to aid the elderly, and for maintenance of open spaces and recreation areas"). *See also State Conducted Lotteries: Hearing on H.R. 6668 and Companion Bills Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary*, 93d Cong. 29–30 (1974) (statement of William S. Lynch, Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice) ("[T]oday most State-operated lotteries are conducted by means of a central computer with information key-punched into its memory banks concerning every aspect of the lottery operation. This method prevents ticket alterations and duplications, improper claims, and thefts. It further operates to hinder organized criminal groups from infiltrating or stealing from these State lotteries."), *quoted in* H.R. Rep. No. 93-1517, at 5–6; 120 Cong. Rec. 22,145 (1974) (statement of Sen. Kennedy) ("None of the abuses which existed in lotteries run for private profit a century ago are present in the lotteries of these States."); 120 Cong. Rec. 12,600 (1974) (statement of Rep. McClory) ("Policing and disclosure policies have been built into the [Illinois lottery] system with the expectation of making impossible the kind of graft or corruption which existed in 19th century lottery systems."); *id.* at 12,604 (statement of Rep. Daniels) ("Thirteen States now conduct State lotteries under the full protection of State law and regulation. During the several years of experience there have been none of the scandals that had been forecast and the lotteries have brought in millions of dollars in revenue for education and other needs.").

"conducted by a State." *Id.* at 5–7 (quoting testimony of Deputy Attorney General Henry E. Petersen).

In 1988, Congress again considered statutory language—this time, supported by the Justice Department—that would have "remove[d] federal restrictions on the advertising of legitimate lotteries and gambling activities in interstate commerce, whether conducted by public, private, or charitable interests." H.R. Rep. No. 100-557, at 3 (1988); *see also id.* at 9 (noting that the bill "would [have] permit[ted] the advertising of 'state-authorized' lotteries, and not merely 'state-conducted' lotteries") (quoting testimony of Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, Department of Justice); 131 Cong. Rec. 25,508 (1985) (statement of Rep. Frank) (introducing earlier version of bill that would have exempted any lottery "authorized and regulated by the State in which it is conducted"). Again, however, Congress rejected the proposal, and members expressed concerns that private for-profit companies could not be trusted to operate lotteries in a publicly beneficial manner. *See, e.g.*, 134 Cong. Rec. 10,317–318, 11,261, 11,376 (1988) (statements of Rep. Wolf). Congress instead passed a version of the bill that gave exemptions to lotteries that were "authorized or not otherwise prohibited by the State in which [they are] conducted," but only if those lotteries were "conducted by a not-for-profit organization or a governmental organization" or "as a promotional activity by a commercial organization." Pub. L. No. 100-625, § 2(a), 102 Stat 3205 (codified at 18 U.S.C. § 1307(a)(2)).

We believe this history reflects a consistent legislative judgment against permitting private for-profit companies to conduct lotteries. It would appear to be inconsistent with this judgment to permit the injection of a private company's profit-making interests into the conduct of the state lottery, because doing so would raise the risk that the lottery business would serve a private commercial motive, rather than serving solely the public interest of the state.

The law of partnership offers useful guidance, by analogy, on the sorts of arrangements with a private management company that would convert a lottery business "conducted by a State" into a joint enterprise between the state and the private entity. Perhaps most significantly, partnership law would suggest that a business becomes a partnership (as distinguished from a principal-agent relationship) when a single entity does not exercise actual control over all significant business decisions. Under the Uniform Partnership Act ("UPA"), which has been widely adopted and followed, "the power of ultimate control" is an essential element that "distinguishes a partnership from a mere agency relationship." Uniform Partnership Act § 202 cmt. 1 (1997); *see also, e.g.*, *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (under New York law, demonstrating "the parties' joint control and management of the business" is necessary to prove the existence of a partnership); *Harbaugh v. Greslin*, 436 F. Supp. 2d 1315, 1321 (S.D. Fla. 2006) (same under Florida law). Similarly, mutual control is a hallmark of a joint venture. *See, e.g.*, *Taylor v.*

*Texaco, Inc.*, 510 F. Supp. 2d 1255, 1262 (N.D. Ga. 2007) (under Georgia law, "The element of mutual control is a crucial element of a joint venture"); *Black's Law Dictionary* 843 (7th ed. 1999) (defining "each member's equal voice in controlling the project" as a "necessary element" of a joint venture). These concepts closely mirror, in our view, the proper meaning of "conducted by a State," consistent with the text and legislative history and purpose of the federal lottery statutes.

In our view, it is also relevant to note that the sharing of a significant interest in the profits and losses of the business is recognized as "characteristic of a partnership." *Steelman v. Hirsch*, 473 F.3d 124, 130 (4th Cir. 2007); *see also, e.g.*, *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 690 (2d Cir.1983) (under New York law, "the crucial element of a joint venture is the existence of a mutual promise or undertaking of the parties to share in the profits . . . and submit to the burden of making good the losses") (quotation marks omitted); *Thomas v. Price*, 718 F. Supp. 598, 605 (S.D. Tex. 1989) (under Texas law, "Major incidents of the partnership relationship are an agreement among the participants to share profits and losses and a mutual right of control to manage the partnership"); *Black's Law Dictionary* at 843 (defining "shared profits and losses" as a "necessary element" of a joint venture). The UPA creates a rebuttable presumption that a person "who receives a share of the profits of a business" is a partner in the business. Uniform Partnership Act § 202(c)(3). Importantly, however, the presumption does not attach if the profits were received "in payment . . . for services as an independent contractor or of wages or other compensation to an employee." *Id.* This result supports the notion that some de minimis portion of profits or revenues may be shared among the parties without creating a partnership, because de minimis profit-sharing is consistent with a principal-agent relationship, rather than a true partnership.[8] We believe this concept is relevant in interpreting the exemption for lotteries "conducted by a State," because the sharing of a significant interest in the profits and losses of the lottery enterprise would be expected to diminish significantly the state's incentive to exercise actual control over the management of the business and would mean also that the lottery would not be conducted solely in the public interest of the state, as Congress has mandated, but rather at least partially in the profit-maximizing interest of the private firm.[9]

---

[8] *Cf. TIFD III-E, Inc. v. United States*, 459 F.3d 220, 233–35 (2d Cir. 2006) (holding that foreign banks' investment in a partnership was properly classified as debt, not equity, for tax purposes where the banks had the contractual right to recoup their investment at an agreed upon rate of return *plus* an opportunity to participate in the profits of the partnership that was, as a practical matter, limited to 2.5% of the banks' total investment—"a relatively insignificant incremental return over the projected eight-year life of the partnership").

[9] Although there may be no bright-line rule for identifying what would constitute a significant, or more than de minimis, ownership interest in the state's lottery business, examples of rules from other statutory and regulatory contexts may be useful by analogy. *See, e.g.*, 15 U.S.C. § 78n(d)(1) (Williams Act provision requiring any person making tender offer for class of stock of publicly traded corporation

For these reasons, we believe that an arrangement by which a state engages in the business of operating a lottery jointly with a private firm that shares substantially in the profits and risks of the enterprise would not be consistent with the statutory exemption. The concerns that apparently led Congress to prohibit private companies from conducting lotteries would still apply if a private company and a state were jointly to own and operate the lottery venture. *See* H.R. Rep. No. 93-1517, at 5–6; 120 Cong. Rec. 22,145 (1974) (statement of Sen. Kennedy) (warning against the abuses of "lotteries run for private profit" and stating the view that such abuses would not be present in state-conducted lotteries). We therefore believe that the exemption for lotteries "conducted by a State" requires that the lottery be "conducted by" the state alone, and not be conducted jointly by the state and by a private for-profit corporation, whether through a formal partnership or through some other form of joint business venture.

## B.

Our conclusion that the state must exercise actual control over all significant business decisions of the lottery and retain all but a de minimis share of the equity interest does not mean that the state in conducting the lottery enterprise may not contract with private firms to provide goods and services necessary to the lottery. States that operate their own lotteries routinely contract with private businesses to print and sell lottery tickets, promote the lottery, insure against loss, consult about games, and perform a wide range of other functions as part of operating the lottery.[10] We do not read the lottery statutes to foreclose these types of arrangements; that a state contracts with a private company to assist in certain functions

---

to file disclosure report with SEC if, after consummation of offer, the person would own more than 5% of the class); H.R. Rep. No. 91-1655, at 3 (1970) (justifying Williams Act disclosure requirement on ground that "shareholders should be fully informed" of acquisitions of equity interests exceeding 5% because "[t]hese acquisitions may lead to important changes in the management or business of the company"); 26 C.F.R. § 1.368-2T(*l*)(2)(iii) & ex. 4 (2008) (IRS rule providing that "de minimis" variations in shareholder identity or proportionality of ownership are disregarded in determining whether transaction qualifies for tax treatment as "reorganization" under 26 U.S.C. § 368(a)(1)(D), and giving as example of such de minimis variation a 1% difference in stock ownership).

[10] *See, e.g.*, *Dalton v. Pataki*, 5 N.Y.3d 243, 271 (2005) ("The Division of the Lottery regularly contracts with outside vendors and other entities for various equipment and services to assist in the operation of the state lottery," under state constitutional provision prohibiting lotteries unless "operated by the state"); *State ex rel. Ohio Roundtable v. Taft*, No. 02AP-911, ¶ 32, 2003 WL 21470307, *6 (Ohio App. June 26, 2003) ("Ohio undisputedly contracts with various vendors for the operation and promotion of the lottery, whether for existing in-state games or the new multi-state Mega Millions," under state constitutional provision prohibiting lotteries unless "conduct[ed]" by "an agency of the state"); Mo. Rev. Stat. § 313.270 (2001) ("The director, pursuant to rules and regulations issued by the commission, may directly purchase or lease such goods or services as are necessary for effectuating the purposes of sections 313.200 to 313.350, including procurements which integrate functions such as lottery game design, supply of goods and services, and advertising."); Minn. Stat. § 349A.07(1) (2004) ("The director may enter into lottery procurement contracts for the purchase, lease, or lease-purchase of the goods or services.").

associated with the lottery, even where the contractor is compensated for its services by a relatively small fixed percentage of the revenues of the lottery, does not mean that the state itself is no longer conducting the lottery. The private contractor in such circumstances—though providing valuable assistance to the state—is not "conducting" the lottery within the meaning of the statutes.

The delegation of management responsibilities to a private contractor presents a more difficult question. As discussed above, the verb "conduct" itself connotes management. Thus, unlike the delegation of other activities necessary to a lottery, such as promoting the lottery or printing tickets, an overbroad delegation of management responsibility would definitely call into question whether the state, and only the state, is exercising actual control over all significant business decisions of the lottery. For instance, simply imposing operating standards, even if freely amendable, would not be enough to give the state the necessary control over all significant business decisions of the lottery. Nor would a regulatory system of legal authorization and license alone be sufficient. Accordingly, we believe that there must be significant limits on the authority the state may delegate and still qualify for the exemption under section 1307(a)(1).

Principles of agency law are instructive in defining the appropriate line in judging a management services contract. To be said to "conduct" a lottery, the state must maintain and exercise control over all significant aspects of the lottery operation. To the extent that such authority is delegated to a private management company, the management company should operate more in the role of an agent of the state, *see* Restatement (Third) of Agency § 1.01 (2006), than a partner that shares in the authority to make significant business decisions. This conclusion is fully consistent with the opinions of the Rhode Island Supreme Court in the *Casino I* and *Casino II* cases discussed above. In particular, a state official or agency must have the authority to direct or countermand operating decisions by the management company at any time. *Cf.* Restatement (Third) of Agency § 8.09, cmt. c (citing *id.* § 1.01, cmt. f(1)) ("The power to give interim instructions is an integral part of a principal's control over an agent and a defining element in a relationship of common-law agency.").[11] The state need not always choose to exercise this authority if it is satisfied from its oversight that the management company is operating the lottery properly, but the existence of this authority is vital for the state to exercise actual control over the business—and to ensure that it has not shared such control with a private company.

For the same reason, we believe that to "conduct" the lottery through the agency of a management company, a state must maintain ready access to information regarding all lottery operations. To this end, as a necessary corollary of its

---

[11] Unlike a principal at common law, which can contract away the right to direct its agents' actions, *id.*, a state may not waive this responsibility, nor may it limit its authority to a veto power. *Cf. Casino II*, 885 A.2d at 706 ("[T]he power to choose is qualitatively different from the lesser power of vetoing another's choice.").

authority over lottery operations, a state should have the right to demand and receive information from the management company concerning any aspect of the lottery operations at any time. *Cf.* Restatement (Third) of Agency § 8.12(3) (agent has duty "to keep and render accounts to the principal of money or other property received or paid out on the principal's account"); La. Civ. Code art. 3003 (2005) ("At the request of the principal . . . the mandatary [agent] is bound to provide information and render an account of his performance of the mandate.").

In addition, the management company must have the affirmative duty to provide the state with any information the company reasonably believes state officials would want to know to enable the state to conduct the lottery. *Cf.* Restatement (Third) of Agency § 8.11 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person."). These notifications will "enable[] the [State] to update and sharpen instructions provided to the [management company]" as the lottery operation evolves. *Id.* cmt. d. We conclude also that a management company must give the state advance notice of any operating decision that bears significantly on the public interest, such as decisions on the kinds of games to be offered to the public and decisions affecting the relative risk and reward of the games being offered, so that the state will have a reasonable opportunity to evaluate and countermand that decision. The affirmative duties to report material information, and to inform the state in advance of significant decisions, are critical to ensuring that the state's legal authority to direct the actions of the lottery translates into actual, practical control over the lottery's operations.

As for the ownership of assets, we do not foreclose the possibility that the state may, consistent with the limits of the exemption, permit the private management contractor to own and provide most of the assets needed for the lottery. Many such assets—computers, printing equipment, possibly the gaming equipment—are likely to be widely available for lease or purchase from other sources if the private company were to withdraw from the contract with the state. Thus, we do not think that a state's contracting with a private management company to provide these assets for its lottery would necessarily put the lottery business under the effective control of the private contractor, so as to make the private company the state's partner in conducting the lottery. Even some non-fungible assets—software, games, accounting systems—can be redeveloped or replaced, and therefore could also be leased by a state for use in its lottery without elevating the role of the company providing the assets to that of a partner or joint venturer in the lottery.

Other assets, such as the trade name and trademarks of the state lottery, may perhaps be truly essential to the state's ownership and control of the lottery, in the

sense that the state could not continue "conducting" its lottery (at least not without serious disruption) unless it retained ownership of these assets after discharging the management company. Ownership of these assets could be viewed as inextricably intertwined with the conduct of the lottery. Were a state to transfer such essential assets to a private company assisting the state in the management of the lottery, the state could become so dependent upon the management company for the continued operation of the business as to call into significant question whether the state is actually conducting the lottery.

As we have discussed above, we believe that the ownership by the private management company of a significant equity interest in the profits of the lottery would go beyond the scope of the exemption. We understand that some states have proposed to enter into agreements with private management firms under which the private company would assist in the management of the lottery and receive a significant share of the lottery's profits or bear a significant share of the risk of losses. In return, it has been proposed that the management company would make a significant upfront payment to the state or make annual disbursements to the state. We believe that such an arrangement would not be consistent with the limited exemption for lotteries "conducted by a State." If a private management company were to oversee the lottery's operations and receive a significant share of the lottery's profits (particularly in return for an investment of capital), we think it clear that the company would not be a mere contractor or agent, assisting the state in operating a lottery that the state conducts, but rather a co-participant in the conduct of the lottery with substantial managerial responsibilities and a significant equity stake in the lottery's success or failure. In such circumstances, the private management company's incentives and ability to influence the lottery would be significant. Where a state has a reduced stake in the profits or losses of a lottery, its incentive to exercise the actual control over all significant business decisions required by the exemption is necessarily diminished. Indeed, in practical respects, an arrangement in which the state cedes to a private firm a significant economic interest in the profits and losses of the business may be functionally quite similar to an arrangement whereby the state licenses a lottery concession to a private company. As described above, these incentives and characteristics are precisely what Congress sought to avoid in enacting the exemption for lotteries "conducted by a State." *See supra* notes 6–7 (contemplating that state-conducted lotteries would be operated for the public benefit).[12]

---

[12] *See also* Colo. Const. art. XVIII, § 2(7) ("Unless otherwise provided by statute, all proceeds from the lottery, after deduction of prizes and expenses, shall be allocated to the conservation trust fund of the state for distribution to municipalities and counties for park, recreation, and open space purposes."); Del. Const. art. II, § 17(a) ("All forms of gambling are prohibited in this State except . . . [l]otteries under State control for the purpose of raising funds"); Ga. Const. art. I, § 2, ¶ 8(c) ("Proceeds derived from the lottery or lotteries operated by or on behalf of the state shall be used to pay the operating expenses of the lottery or lotteries, including all prizes, without any appropriation required by law, and for educational programs and purposes as hereinafter provided."); La. Const. art. XII, § 6(A)(1) ("The

That said, we think it is permissible for a state to compensate private contractors with some portion of the lottery's revenues or with some financial incentives that are contingent on the lottery's achievement of certain revenue objectives. For example, a state may agree to increase a private management company's fee by a certain amount if the lottery's revenues grow by a specified percentage in a given year. So long as the management company is not to receive more than a de minimis share of the lottery's profits, such an agreement would not significantly diminish the state's incentive to exercise actual control over the lottery.

Finally, it has been suggested that a private management company should be required to deposit lottery revenues into accounts owned by and maintained in the name of the state or state agency overseeing the lottery, and that the company be permitted to disburse funds from these accounts only on terms set forth in the management agreement. We believe that such accounting practices could be helpful in ensuring that the state, and not the private management company, is actually conducting the lottery business. Although we are not able to say that any particular accounting practice is mandated by the statutes, the more transparent the accounting procedure,[13] the more likely it will be that the state is in fact exercising active ownership and control over the enterprise.

---

net proceeds from the operation of the lottery shall be deposited in a special fund created in the state treasury entitled the Lottery Proceeds Fund."); N.D. Const. art. XI, § 25 ("[T]he legislative assembly shall authorize the state of North Dakota to join a multi-state lottery for the benefit of the state of North Dakota"); Mo. Const. art. III, § 39(b)(2), (3) ("The money received by the Missouri state lottery commission from the sale of Missouri lottery tickets, and from all other sources . . . shall be appropriated solely for public institutions of elementary, secondary and higher education."); N.H. Const. pt. 2, art. 6-b ("All moneys received from a state-run lottery and all the interest received on such moneys shall, after deducting the necessary costs of administration, be appropriated and used exclusively for the school districts of the state."); N.J. Const. art. IV, § 7, ¶ 2.C ("It shall be lawful for the Legislature to authorize the conduct of State lotteries restricted to the selling of rights to participate therein and the awarding of prizes by drawings when the entire net proceeds of any such lottery shall be for State institutions and State aid for education"); Tenn. Const. art. XI, § 5 ("[T]he legislature may authorize a state lottery if the net proceeds of the lottery's revenues are allocated to provide financial assistance to citizens of this state to enable such citizens to attend post-secondary educational institutions located within this state."); Va. Const. art. X, § 7-A ("Lottery proceeds shall be appropriated from the Fund to the Commonwealth's counties, cities and towns, and the school divisions thereof, to be expended for the purposes of public education."); Wis. Const. art. IV, § 24(6)(a) ("[N]et proceeds of the state lottery shall be deposited in the treasury of the state, to be used for property tax relief for residents of this state as provided by law.").

[13] *See, e.g.*, Cal. Gov't Code § 8880.41 ("The director shall make and keep books and records that accurately and fairly reflect each day's transactions, including, but not limited to, the distribution of tickets or shares to lottery game retailers, receipt of funds, prize claims, prize disbursements or prizes liable to be paid, expenses and other financial transactions of the lottery . . . ."); *id.* § 8880.42 ("The director shall provide a monthly cumulative sales report to the commission and the Controller within 15 days after the end of each month.").

### III.

In sum, in order to satisfy the federal lottery statute exemption for lotteries "conducted by a State," the state must exercise actual control over all significant business decisions made by the lottery enterprise and retain all but a de minimis share of the equity interest in the profits and losses of the business, as well as the rights to the trademarks and other unique intellectual property or essential assets of the state's lottery. It is permissible under the exemption for a state to contract with private firms to provide goods and services necessary to enable the state to conduct its lottery, including management services, as discussed herein.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*